ELECTRONICALLY FILED

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**CENTRAL DIVISION AT LEXINGTON**

| | |
|---|---|
| **FORTUNE HI-TECH MARKETING, INC.,** | ) |
| | ) |
| **PLAINTIFF,** | ) |
| | ) |
| **VS.** | ) **CASE NO. 5:10-CV-123-KSF** |
| | ) |
| | ) |
| **JOSEPH M. ISAACS, et al.,** | ) |
| | ) |
| **DEFENDANTS.** | ) |
| | ) |

\*\*\*\*\* \*\*\*\*\* \*\*\*\*\* \*\*\*\*\*

Plaintiff, Fortune Hi-Tech Marketing, Inc. ("Fortune"), submits this memorandum in opposition to the motion to dismiss filed by Defendants, Joseph M. Isaacs ("Isaacs") and Fortune Social, LLC ("FS") (collectively, "Defendants").

**I.**
**INTRODUCTION**

This case is not merely about a defendant who decided to use a website to harass and defame a plaintiff. It is a case about the Defendants' misappropriation of valuable intellectual property that Fortune spent years developing. More importantly for purposes of this motion, it is not a case that turns solely on a *Zippo* analysis of personal jurisdiction. Defendants' contacts with this forum are far more significant than merely operating a website, as they include an attempt to extort millions of dollars from Fortune through the misappropriation of Fortune's intellectual property. Because of the severity of Defendants' actions and their purposeful efforts to harm a specific Kentucky corporation, jurisdiction in this Court is appropriate.

## II.
## FACTS

Fortune is a direct sales company that markets products and services to end user consumers through Independent Representatives ("IRs").[1]  Fortune has adopted the multi-level marketing ("MLM") business model to accomplish this goal.[2]  MLM businesses do not adopt the conventional advertising and retail sale methods of many larger stores; instead, they follow the business model of direct selling, through the IRs, to individual customers.[3]

Fortune was formed in 2000.  Since that time, the trademarks and service marks FORTUNE HI-TECH MARKETING and FHTM have become well-known in the industry and have established goodwill and a solid reputation for quality services and products provided through Fortune.  Fortune offers a variety of products and services, including (but not limited to) satellite television service through Dish Network; internet access through UUNET; cellular phone service and equipment provided by, *inter alia*, Alltel, AT&T, Nextel, Sprint, T-Mobile and Verizon Wireless; long distance phone service through Power Net Global; voice messaging services; travel services; and nutritional products through True Essentials.[4]  Fortune presently has over one thousand active IRs in the Commonwealth of Kentucky.[5]

Isaacs claims to be a lawyer by training who is now involved with network marketing businesses.[6]  Isaacs holds himself out as a "marketing guru" who has the "ability to look at a venture and see things from angles that most people miss."[7]  Apparently based on this expertise

---

[1]      *See* Affidavit of Tom Mills in support of Fortune's Motion for Preliminary Injunction, a copy of which is attached as Exhibit A, at ¶ 2.

[2]      *Id*.

[3]      *Id*.

[4]      *Id*. at ¶ 3.

[5]      *See*  Affidavit of Tom Mills, a copy of which is attached Exhibit B, ¶ 3.

[6]      *See* "MySpace" website of Isaacs, at www.myspace.com/fortune_marketing.  A partial copy of the initial page of the website is attached as Exhibit C.

[7]      *See* "LinkedIn" profile webpage for Joseph Isaacs, at http://www.linkedin.com/in/isgtelecom.  A copy of the webpage is attached as Exhibit D.

and unique insight into business operations, Isaacs chose to become a Fortune IR in September 2009.   Shortly thereafter, Isaacs organized FSL to operate a website called www.fortunesocial.com (the "Website").   The Website was developed to facilitate networking exclusively among Fortune IRs and to operate in much the same way that Facebook or LinkedIn operate.[8]   Until the filing of the Complaint in this action, the Website at all times displayed logos and name identical to or confusingly similar to Fortune's logos and tradename.   The Website has also displayed some of the logos of Fortune's product vendors.[9]   Indeed, according to Isaacs, the Website was first developed "to be an umbrella for everything positive about [Fortune]."[10]

FSL also created other websites that have relied predominantly on references to Fortune. FSL is the listed registrant of the domain names fhtmwebconnect.com and fortunewebinars.com. The website www.fhtmwebconnect.com is identical to the Website.   The website www.fortunewebinars.com may be accessed by a link from the Website and provides online training to Fortune IRs who are registered members of the Website.   Isaacs is also the registered agent for and director of  ISG-Telecom Consultants International, Inc. ("ISG"), which is the registrant of the domain name perfectcreditgroup.org.   The website hosted at this domain is identical to the Website.

FSL issued an online press release on Feb. 1, 2010, previously available at http://www.1888pressrelease.com/fortune-social-launches-fhtm-webconnect-first-rea-time-web-pr-181959.html.[11]   In this release, FSL promoted its FHTM Webconnect application specifically for Fortune IRs and stated that it is "aggressively priced," evidencing that FSL has offered its

---

[8]       *See* e-mail forward from Diane Graber dated February 5, 2010, a copy of which is attached as Exhibit E.
[9]       It should be noted such display of the logos of these third party vendors are strictly prohibited under Fortune's agreements with the third-party vendors as well as the Policies and Procedures that govern IR activities.
[10]      *See* screen images of www.fortunesocial.com accessed on April 5, 2010, copies of which are attached as Exhibit F; *see also* Affidavit of Jason T. Ams, a copy of which is attached as Exhibit G, at ¶ 2.
[11]      A copy of this press release is attached as Exhibit H.  As of the filing of this Opposition, this website could no longer be accessed directly.  *See also* Exhibit G, ¶ 3.

product into the marketplace and, presumably, has received revenue from its marketing efforts. Defendants also posted on the Website that "the fortune social team has developed a webinar system just for FHTM reps,"[12] demonstrating again that the entire purpose for the Website was to cater to Fortune IRs in an effort to obtain business from them.

The misappropriation of Fortune's logo and business name has been pervasive throughout the Website. In fact, Fortune IRs who chose to visit the Website would occasionally post messages commending Fortune for providing the Website as a useful resource for them.[13] At no time, however, was Fortune affiliated in any way with FSL. Defendants' unauthorized use of Fortune's logo and name was sufficiently misleading to cause Fortune's own IRs to believe that the two businesses were directly affiliated.

After discovering the existence of the Website, Fortune contacted Defendants and requested that they take it down, as it contained incorrect information and misappropriated Fortune's intellectual property.[14] Fortune had, by that time, also discovered that messages were being sent from the Website to Fortune's IRs that appeared to have been sent by Paul Orberson, the president of Fortune. Defendants denied any improprieties and refused to remove the Website.[15]

Instead, Defendants contacted Fortune with an offer to sell the Website for $2,500,000.[16] As Fortune recognized that this "offer" was actually an attempt to extort money from it in

---

[12]     *See* screen captures of posted message accessed on April 5, 2010, copies of which are attached as Exhibit I; *see also* Exhibit G, at ¶ 4.
[13]     *See, e.g.,* posting "Thank You Fortune Social" on www.fortunesocial.com dated March 23, 2010, a copy of which is attached as Exhibit J; *see also* Exhibit G, at ¶ 5.
[14]     A copy of Fortune's demand letter is attached as Exhibit K.
[15]     A copy of Defendants' response is attached as Exhibit L.
[16]     *See* e-mail from Isaacs to Fortune's general counsel, dated March 16, 2010, a copy of which is attached as Exhibit M.

exchange for its own trademarks, Fortune quickly declined the offer.[17]   Undeterred, Isaacs sent e-mails to Fortune's general counsel and a Fortune employee in Kentucky suggesting that he negotiate directly with Mr. Orberson, apparently so that he could make the sales pitch to him directly.[18]   In light of Isaacs's behavior, Fortune denied this request and terminated its relationship with Isaacs.  Isaacs then decided to file a complaint with the Lexington, Kentucky Better Business Bureau disparaging Fortune's business operations and accusing it of unlawful activities.

Having been terminated, Isaacs chose to attack Fortune.  Indeed, Isaacs was well aware that he had developed a forum of which many Fortune IRs were attentive followers.  The Website, which Isaacs had once used to promote Fortune's business, was now available to him to disparage and defame Fortune to the backbone of its sales force.

The change in Isaacs's operation of FSL was noticeable immediately.  In late February 2010, Isaacs had been posting messages to his Website about the strength of Fortune as a solid business opportunity.  By the first week of April, Isaacs's posts focused on an investigation of Fortune by the Attorney General of North Dakota (an investigation which ended with an agreement in which there was no finding of any impropriety), and various accusations that Fortune and its officers were engaged in fraud.[19]

Through his false and malicious statements directed to Fortune's IRs who visited the Website, Isaacs has attempted to orchestrate a wide-scale attack on Fortune's business.  Isaacs's improper activities have included the solicitation by Isaacs of potential members of a class action lawsuit against Fortune based upon Isaacs's trumped-up allegations.  Additionally, Isaacs has

---

[17]    *See* e-mail from Fortune's general counsel to Isaacs, dated March 18, 2010, a copy of which is attached as Exhibit N.

[18]    *See* e-mail from Isaacs to Fortune employee Chad Wooten, dated March 24, 2010, attached as Exhibit O and Isaacs's e-mail to Fortune's general counsel in Exhibit N.

[19]    *See e.g.*, Exhibit F.

contacted or attempted to contact government officials in different jurisdictions, including but not limited to Montana, in an attempt to influence their actions toward Fortune. Isaacs's intent in making these contacts has been to initiate investigations of Fortune, which would then provide him with additional reasons to disparage Fortune. Isaacs has posted numerous messages on Facebook accounts of Fortune IRs continuing his disparagement of Fortune. These included a modification of a photograph of Fortune's president such that his shirt appeared to be the black-and-white stripes of a prison uniform. This photograph was tied to a link to what purported to be a complaint drafted by the Attorney General of California, suggesting that Fortune's activities were illegal and that its directors could be subjected to prison terms.

This complaint is a hoax.[20] It was not drafted by the Attorney General of California and was certainly never filed. Instead, it was the product of cut-and-pasting from an actual complaint against an unrelated company. Isaacs claims that he neither drafted nor distributed the phony complaint.[21] This denial, however, is at odds with information obtained from an individual who posted the hoax complaint to his own website after receiving it from Isaacs, then later removed it after being advised that it was fraudulent.[22]

Continuing his rampage, Isaacs created a "press release" that purports to have been drafted by a Fortune IR in Lexington, Kentucky.[23] The press release appears to have been drafted on behalf of Fortune, providing another example of Isaacs's willingness to impersonate a Fortune representative in Kentucky. Unfortunately for Isaacs, he apparently forgot to change the

---

[20]     A copy of the phony complaint is attached as Exhibit P. *See also* Exhibit G at ¶ 6.

[21]     *See* "CA vs. FHTM" by Isaacs dated April 11, 2010, at http://www.fortunesocial.com/fortune-hi-tech-blogs/ca-vs-fhtm.html. A copy of the post is attached as Exhibit Q.

[22]     *See* "California complaint against Fortune… possibly a hoax?" by Kevin Thomson dated April 5, 2010, at http://www.themlmattorney.com/california-complaint-against-fortune-possibly-a-hoax/. A copy of the post is attached as Exhibit R.

[23]     *See* "press release" titled "FHTM creates product bundles to aid Orberson financial situation" dated April 2, 2010, at http://www.free-press-release.com/news-fhtm-creates-product-bundles-to-aid-orberson-financial-situation-1270208990.html. A copy of the "press release" is attached as Exhibit S.

e-mail address provided with the contact information for the Kentucky IR, instead noting that it was \*\*\*@fortunesocial.com.   Isaacs's e-mail address, as evidenced by Exhibits K and L, is joe@fortunesocial.com.

Defendants now claim, through Isaacs's affidavit, that the Website has a broad scope, with one of its "primary purposes . . . to report industry news . . .."[24]  To the extent that this is true, it is only because Defendants made dramatic changes to the Website after learning that this action had been filed.   A copy of the home page of the Website before this action was filed is attached as Exhibit T.[25]   Notably, *every* "MLM Blogs" entry is either expressly or impliedly directed at Fortune.  A copy of the home page of the Website on the date of this filing is attached as Exhibit U.[26]   Now, the Website does appear to contain information (or misinformation) on a wider array of topics and businesses in addition to Fortune.   This is only so, however, because Defendants learned that the complaint had been filed and apparently did not consider the fact that Fortune would have captured a complete copy of the Website before filing this action.   Indeed, Fortune did so because it expected that Defendants would do precisely what they did – doctor up the Website in an attempt to make it appear legitimate.

Defendants' actions in this case, from originally setting out to profit through the use of Fortune's marks, name and reputation, to their later efforts to extort money from Fortune and their impersonation of a Kentucky IR, have been directed specifically at Fortune, a citizen of Kentucky.   As a result of both Defendants' contacts with Kentucky and the effects their actions have caused here, Defendants are subject to the jurisdiction of this Court.

---

[24]     Isaacs's affidavit, Exhibit A to Defendants' supporting memorandum.

[25]     *See also* Exhibit G, at ¶ 7.

[26]     *See also* Exhibit G, at ¶ 8.

**III.**
**ARGUMENT**

**A.**   **Fortune Need Only Demonstrate a Prima Facie Showing of Personal Jurisdiction.**

With the complaint having only recently been served, no discovery having been taken, and no evidentiary hearing having yet been convened, all permissible inferences must be drawn in favor of Fortune on this motion.  *CompuServe, Inc. v. Patterson*, 89 F.3d 1257, 1261-62 (6th Cir. 1996).  To overcome a motion to dismiss for lack of personal jurisdiction, the plaintiff "need only make a prima facie showing of jurisdiction."  *Neogen Corp. v. Neo Gen Screening, Inc.*, 282 F.3d 883, 887-88 (6th Cir. 2002).  Fortune has provided sufficient factual support to identify a multitude of reasons this Court may properly exercise jurisdiction over Defendants, including the facts contained in the affidavit of Tom Mills supporting Fortune's motion for a preliminary injunction, the affidavit of Mr. Mills that accompanies this memorandum, and the affidavit of Fortune's counsel verifying the exhibits attached to this memorandum that were obtained from the Internet.

**B.**   **Defendants are Subject to Specific Personal Jurisdiction in Kentucky.**

Defendants may be subject to either general or specific personal jurisdiction.  A court may exercise general personal jurisdiction where "a defendant's contacts with the forum state are of such a continuous and systematic nature that the state may exercise personal jurisdiction over the defendant even if the action is unrelated to the defendant's contacts with the state."  *Third Nat'l Bank in Nashville v. WEDGE Group, Inc.*, 882 F.2d 1087, 1089 (6th Circ. 1989).  Although Defendants have undoubtedly conducted business with Kentucky residents, Fortune is not requesting that the Court find that they are subject to general personal jurisdiction.  As Defendants are clearly subject to specific personal jurisdiction, the Court need not engage in an analysis of general personal jurisdiction.

The Sixth Circuit has established a three-part test for determining the propriety of the exercise of specific personal jurisdiction:

> First, the defendant must purposefully avail himself of the privilege of acting in the forum state or causing a consequence in the forum state. Second, the cause of action must arise from the defendant's activities there. Finally, the acts of the defendant or consequences caused by the defendant must have a substantial enough connection with the forum state to make the exercise of jurisdiction over the defendant reasonable.

*Southern Machine Co. v. Mohasco Indus., Inc.*, 401 F.2d 374, 381 (6th Cir. 1968). If the first two *Mohasco* elements are established, "an inference arises that [the] third factor is also present." *CompuServe*, 289 F.3d at 875.

In this diversity case, personal jurisdiction is determined by Kentucky's long-arm statute, KRS 454.210(2). *Nat'l Can Corp. v. K Beverage Co.*, 674 F.2d 1134, 1136 (6th Cir. 1982). This statute has been interpreted as being "coextensive with the boundaries of the due process clause." *Davis H. Elliott Co., Inc. v. Caribbean Util. Co., Ltd.*, 513 F.2d 1176, 1180-81 (6th Cir. 1975). The inquiry, therefore, is whether the exercise of personal jurisdiction over Defendants is constitutionally permissible.

Under both Federal law and Kentucky's long-arm statute, jurisdiction is appropriate. KRS 454.210(2)(a)(1) provides that jurisdiction is appropriate over defendants who transact business within the Commonwealth. KRS 454.210(2)(a)(3) provides that jurisdiction is appropriate over defendants who cause tortious injury by an act or omission in the Commonwealth. As discussed below, both of these sub-sections of the long-arm statute are met, and this Court may properly exercise jurisdiction over Defendants.

## C.   Defendants' Efforts to Extort Money From Fortune Subject Them to the Jurisdiction of This Court.

Defendants spend the first ten pages of their memorandum on the traditional inquiries of whether personal jurisdiction may be exercised as a result of physical contact, whether in person

or by mail or telephone.   They complete their analysis by focusing on the *Zippo* test for determining personal jurisdiction, while assiduously avoiding any substantive discussion of the cases in the Sixth Circuit that are most instructive on the issue under factual circumstances such as those presented in this case.   In doing so, Defendants ignore the fact that they demanded that Fortune pay $2.5 million for the Website, which was intentionally developed to confuse its users into believing that it was affiliated with Fortune.   Their failure to mention this demand is understandable, for while jurisdiction is also appropriate under the *Zippo* analysis, as discussed below, Defendants' jurisdictional objections may be disposed of most readily as a result of their attempted extortion.

Defendants demanded that Fortune pay $2.5 million in exchange for the Website, which was compromised in large part of Fortune's own intellectual property.   This demand was made by e-mail sent to Fortune's general counsel, who maintains an office in Kentucky.[27]   Defendants subsequently sought, through another e-mail to a Fortune employee in Kentucky, an audience directly with the president of Fortune, who resides in central Kentucky.[28]   Although Defendants' actions cannot possibly be considered a legitimate way of doing business, they nonetheless do constitute the conduct of business in Kentucky.   Accordingly, Defendants are subject to personal jurisdiction pursuant to KRS 454.210(2)(a)(1) and (3).

*Panavision Int'l, L.P. v. Toeppen*, 141 F.3d 1316 (9th Cir. 1998), addressed a similar situation.   In *Panavision*, the defendant (Dennis Toeppen) established a website using Panavision's trademark as the domain name (Panavision.com).   Panavision demanded that Toeppen remove the website, as it infringed on Panavision's trademark.   Toeppen declined to do so, and instead suggested that Panavision purchase the domain name from him for $13,000.  *Id.*

---

27      *See* Exhibit L.
28      *See* Exhibit M.

at 1319.  Panavision then sued Toeppen, and Toeppen moved to dismiss for lack of jurisdiction, arguing that all of his actions were taken in Illinois, where he resided.  The district court rejected his argument and subsequently granted summary judgment in favor of Panavision.

The denial of Toeppen's motion to dismiss was affirmed on appeal, with the court beginning its analysis by determining that Toeppen had "purposefully directed" his activities toward a California resident (Panavision).  This reasoning was based largely on the "effects test" established in *Calder v. Jones*, 465 U.S. 783 (1984), through which personal jurisdiction may be established by "(1) intentional actions (2) expressly aimed at the forum state (3) causing harm, the brunt of which is suffered – and which the defendant knows is likely to be suffered – in the forum state."  *Core-Vent Corp. v. Nobel Industries AB*, 11 F.3d 1482, 1486 (9th Cir. 1993) (construing the *Calder* test).  Although the court agreed that "something more" than merely registering a website is required to subject a non-resident to jurisdiction, it found that jurisdiction was proper because

> Toeppen engaged in a scheme to register Panavision's trademarks as his domain names for the purpose of extorting money from Panavision.  His conduct, as he knew it likely would, had the effect of injuring Panavision in California where Panavision has its principal place of business and where the movie and television industry is centered.  Under the "effects test," the purposeful availment requirement necessary for specific, personal jurisdiction is satisfied.

*Id*. at 1322.

A similar situation was addressed in *Morgan Stanley Dean Witter & Co. v. Smart Ideas*, 99 Civ. 8921 (S.D. N.Y. December 15, 1999), discussed in *Radio Computing Services, Inc. v. Roland Computing Services*, 2003 WL 1107443 (S.D. N.Y. March 13, 2003).[29]  In *Morgan Stanley*, the defendant attempted to sell a domain name it had registered (msdwonline.com) to

---

[29]     Fortune has attached a copy of the order and transcript of the hearing from this case as collective Exhibit V.

Morgan Stanley for $75,000.[30]  The court held that the "very purpose of the defendant's act . . . is to attack Morgan Stanley and *to extort money from* Morgan Stanley because of a confusingly similar domain name that was created for no legitimate purpose."  *Radio Computing*, at *1 (emphasis added).  In determining that the defendant was subject to jurisdiction in New York, the court found that the "services rendered in the State that they offer is elimination of a confusingly similar name if their outrageous terms are accepted.  That's business.  It may not be nice business, but it's business."  *Id*.  The defendant's conduct, therefore, fell within the New York long-arm statute, which confers jurisdiction over individuals transacting business in New York.  As a result, the court determined that it had personal jurisdiction over the defendant.

The same is true here, where Defendants' actions have been largely the same as those of the defendants in *Panavision* and *Morgan Stanley*.  The defendants in each case were asked to stop the use of the offending domain name.  The defendants in each case refused to do so and, instead, demanded money in exchange for the domain name.  (Notably, Toeppen's demand of $13,000 and Smart Idea's demand of only $75,000 are but small fractions of Defendants' outrageous $2.5 million demand here.)  In each case, the defendants purposefully directed their activities at a resident of another state; here, the Website was established exclusively in connection with Fortune and its IRs and was intended to establish a forum for those IRs to communicate and purchase products and services.  In each case, the defendants sought to hide behind state lines in an effort to avoid answering for their actions.  Just as the courts in *Panavision* and *Morgan Stanley* recognized that the defendants' actions constituted the conduct of business in the states of the plaintiffs' principal office, so too should this Court find that

---

[30]      *See* Patrick McGeehan, *Morgan Stanley Wins Fight Over Internet Domain* Name, N.Y. Times, Jan. 8, 2000, Late Edition at C2 (discussing opinion and identifying the price demanded by defendant as $75,000).  A copy of the article is attached as Exhibit W, and is available at http://www.nytimes.com/2000/01/08/business/morgan-stanley-wins-fight-over-internet-domain-name.html?pagewanted=1.

Defendants have conducted business in Kentucky through their attempt to extort money from Fortune.

**D.**   **Defendants' Fraudulent Acts Subject Them to Jurisdiction in Kentucky.**

As discussed above, Defendants have taken other tortious actions directed at Fortune in Kentucky.  As described above, Defendants have distributed a phony complaint purporting to have been prepared by the Attorney General of California to numerous recipients, and Fortune believes that Isaacs himself drafted the hoax complaint.  Similarly egregious is Isaacs's preparation and distribution of a fake press release that purports to have been prepared by a Fortune IR in Lexington, Kentucky.  While the press release appears to have been prepared by a representative of Fortune located at Fortune's headquarters,[31] the press release describes fictitious investigations, the false announcement of an investigation by the Attorney General of Kentucky, and Fortune's effort to build a war chest for its officers to protect themselves in the non-existent investigations.

Defendants' actions are so odd that Fortune has not been able to locate a prior case addressing such a situation in the context of a dispute over personal jurisdiction.  It should go without saying, however, that a Defendant who impersonates a Kentucky resident should not be surprised to be called into Court in Kentucky to answer for his fraudulent acts.  Indeed, KRS 424.210(2)(a)(3) contemplates jurisdiction over non-residents committing such tortious acts.  Defendants, in fact, seem to agree that jurisdiction for such actions is proper:

> If a court finds that a defendant's actions meets [*sic*] the standard of purposeful direction, then personal jurisdiction may be asserted based on Internet activities which do not meet the requisite level of interactivity or minimum contacts needed for other tests of personal jurisdiction in Internet cases.  When the "actual content of the communications into the forum gives rise to an intentional tort action, that alone may constitute purposeful availment."  *Neal v. Janssen*, 270 F.3d 328, 332

---

[31]   The telephone number provided for the Fortune IR is the main telephone line for Fortune's office in Lexington.  Exhibit B, ¶ 4.

(6th Cir. 2001).  The court further opined, "[i]t is the quality of the contacts, not the quantity, that determines whether they constitute 'purposeful availment.'"

(Defendants' supporting memorandum, p. 15.)  The content of Defendants' communications into the forum (*e.g.*, the posting of phony complaints and phony press releases) undoubtedly gives rise to civil tort claims – at a minimum.  Defendants are, therefore, subject to the jurisdiction of this Court.

**E.** **Defendants' Misappropriation of Fortune's Intellectual Property Through the Operation of the Website Subjects Them to Jurisdiction in Kentucky.**

Fortune believes that the above analysis is sufficient for this Court to exercise jurisdiction over Defendants.   Nonetheless, as Defendants spend the entirety of their supporting memorandum discussing the traditional reasoning underlying the exercise of personal jurisdiction, along with the reasoning developed by *Zippo* and similar cases, Fortune will address those arguments here.

First, it is notable that Defendants have already acknowledged that they misappropriated Fortune's logos.  After Fortune's counsel provided Isaacs, by e-mail, with a copy of Fortune's motion for preliminary injunction, Isaacs responded by stating that "all logos in question were previously removed."[32]  Although Defendants' misappropriation of Fortune's logos was already indisputable, Isaacs's e-mail removes all doubt.  The question for purposes of Defendants' motion, therefore, is not whether Defendants are liable for having misappropriated Fortune's intellectual property – that question has already been answered in the affirmative by Isaacs. Instead, the question is whether the Website operates in such a manner that this Court has jurisdiction to find that Defendants are liable.

One of the most commonly-cited cases on the exercise of personal jurisdiction resulting from the operation of a website is *Zippo Manufacturing Co. v. Zippo Dot Com, Inc.*, 952 F. Supp.

---

[32]     *See* e-mail from Isaacs to Fortune's counsel, a copy of which is attached as Exhibit X.

1119 (W.D. Penn. 1997).   In *Zippo*, the defendant ("Dot Com") registered the domain names "zippo.com," "zippo.net" and "zipponews.com."   The websites that were operated under these domain names provided information about Dot Com, as well as the ability to purchase news services.   Dot Com would provide customers with passwords in order to access its website and purchase the services, and it issued passwords to residents of Pennsylvania.

The court noted that the law governing the exercise of personal jurisdiction as a result of Internet activities was in its infancy.   It determined, however, that "the likelihood that personal jurisdiction can be constitutionally exercised is directly proportionate to the nature and quality of commercial activity that an entity conducts over the Internet.   This sliding scale is consistent with well developed personal jurisdiction principles."   *Id*. at 1124.   The "sliding scale" described in *Zippo* consists of three general areas:

> At one end of the spectrum are situations where a defendant clearly does business over the Internet. . . . At the opposite end are situations where a defendant has simply posted information on an Internet Web site which is accessible to users in foreign jurisdictions. . . . The middle ground is occupied by interactive Web sites where a user can exchange information with the host computer.   In these cases, the exercise of jurisdiction is determined by examining the level of interactivity and commercial nature of the exchange of information that occurs on the Web site.

*Id*.

The court found that Dot Com had conducted business with residents of Pennsylvania through an interactive website (the "middle ground"), and that it was subject to jurisdiction in Pennsylvania as a result.   Specifically, the court held that Dot Com "repeatedly and consciously chose to process Pennsylvania residents' applications and to assign them passwords," thereby purposefully availing itself of the privilege of doing business in Pennsylvania.   *Id*. at 1126.   In addition, the court found that "the cause of action arises out of Dot Com's forum-related conduct in this case."   *Id*. at 1127.   Because the plaintiff had asserted claims of trademark infringement,

and because the plaintiff was a Pennsylvania corporation, "a substantial amount of the injury from the alleged wrongdoing [was] likely to occur in Pennsylvania. *Id*. The court also noted

> [t]here can be no question that Pennsylvania has a strong interest in adjudicating disputes involving the alleged infringement of trademarks owned by resident corporations. We must also give due regard to the Plaintiff's choice to seek relief in Pennsylvania.

*Id*.

Based on its analysis of the level of Dot Com's activities, the allegations that Dot Com was committing trademark infringement, the fact that the plaintiff was located in and would suffer damage in Pennsylvania, and the interest of Pennsylvania in protecting its citizens from trademark infringement, the court concluded that jurisdiction over the non-resident defendant was proper.

Courts in the Sixth Circuit have followed the reasoning of *Zippo* in exercising personal jurisdiction over non-residents. In *Neogen Corp. v. Neo Gen Screening, Inc.*, 282 F.3d 883 (6th Cir. 2002), the plaintiff ("Neogen") was a Michigan company that operated a business involving the development and marketing of various products and services, including diagnostic test kits. It operated a website at www.neogen.com. The defendant ("NGS") was a Pennsylvania company that operated a business through which it performed diagnostic testing of blood samples. It operated a website at www.neogenscreening.com. Neogen sued NGS in Michigan for, among other things, trademark infringement and unfair competition, and NGS moved to dismiss the complaint for lack of personal jurisdiction. The district court granted NGS's motion, but the decision was reversed on appeal.

The Court of Appeals for the Sixth Circuit found that NGS conducted business in Michigan by, among other activities, providing residents of Michigan with passwords to access information on its website. The court found that the "granting of passwords to Michigan

16

residents as part of a contract for NGS's services is an interactive usage showing that NGS has intentionally reached out to Michigan customers and enabled them to use NGS's services from Michigan." *Id*. at 890-891. As a result of this activity, the court found that NGS had met the "purposeful availment" portion of the *Mohasco* test. *Id*. at 892.

The court also concluded that the second part of the *Mohasco* test – that "the cause of action must arise from the defendant's activities [in the forum state]" – was satisfied because Neogen alleged NGS's trademark infringement caused harm in Michigan, where Neogen's headquarters were located. *Id*. Finally, the third element of the *Mohasco* test – "the acts of the defendant or consequences caused by the defendant must have a substantial enough connection with the forum state to make the exercise of jurisdiction over the defendant reasonable" – was met because of its business contacts with Michigan consumers. *Id*.

Shortly after *Neogen* was decided, the Court of Appeals for the Sixth Circuit again held that personal jurisdiction was appropriate as a result of a non-resident's misappropriation of intellectual property by use of a website. In *Bird v. Parsons*, 289 F.3d 865 (6th Cir. 2002), the plaintiff ("Bird"), an Ohio resident, operated a computer software business called Financia, Inc. One of the defendants ("Parsons"), a California resident, registered the domain name "efinancia.com" through defendant Dotster, Inc. ("Dotster"), a Washington resident. Bird filed a lawsuit in Ohio against Parsons, Dotster and others alleging trademark infringement, violations of the AntiCybersquatting Consumer Protection Act and conspiracy.

The district court held that it had jurisdiction over all of the defendant, and the Sixth Circuit agreed. In finding that jurisdiction was appropriate, the court generally followed the reasoning of *Neogen*. It expounded, however, upon *Neogen*'s discussion of the third prong of *Mohasco* in the context of trademark cases, holding that "violations of federal trademark law are

*analogous to tort cases.*  *Id.* at 876.  Accordingly, "the injury occurs both in places where the plaintiff does business and in the state where its primary office is located."  *Id.*, citing *Panavision*, *supra*; *Indianapolis Colts, Inc. v. Metro. Baltimore Football Club, Ltd. P'ship*, 34 F.3d 410, 411-12 (7th Cir. 1994).

Under the reasoning of each of these cases, Defendants are subject to the jurisdiction of this Court as a result of the operation of the Website.  Defendants have purposefully availed themselves of the privilege of operating in Kentucky.  The Website is interactive and, at a minimum, falls within the middle ground of *Zappo*'s sliding scale.  Individuals accessing the Website may take a number of actions.  They may access a "Rewards Mall," which allows them to purchase products through a website called "www.bigbrandmall.com."[33]  They may utilize www.fortunewebinars.com and www.fhtmwebconnect.com, which were unquestionably developed for Fortune's IRs.  They may sign up for a password that allows them to interact with other users of the Website.  Although IRs from other states have also signed up for passwords to the Website, Defendants admit that five Fortune IRs in Kentucky have received passwords.[34]  Through its own research, however, Fortune has discovered that it appears that at least 10 IRs who are residents of Kentucky have signed up for access to the Website.[35]  This necessarily means that Defendants transmitted passwords to them in Kentucky.  While Defendants suggest that this small number of Kentucky residents is insufficient to establish personal jurisdiction, the appropriate inquiry is on "the quality of the contacts, not the quantity . . .."  *Neal v. Janssen*, 270 F.3d 328, 332 (6th Cir. 2001) (cited in Defendants' supporting memorandum at page 15).  Here, where the contacts constitute efforts by Defendants to mislead Kentucky IRs into believing that

---

[33]    Notably, Fortune has offered a feature on its website called "FHTM Rewards Mall" for years, which appears to perform the same function as the "Rewards Mall" offered through the Website.  Exhibit B, ¶ 5.
[34]    Isaacs affidavit, ¶ 19.
[35]    *See also* Exhibit G, at ¶ 9.

an affiliation exists between Defendants and Fortune, with the purpose for this deception being to generate revenue for Defendants, the contacts are significant.  The fact that Defendants have issued passwords to Kentucky residents, together with their other contacts with Kentucky discussed above, brings them well within the holdings of *Zippo*, *Neogen* and *Bird* regarding "purposeful availment."

The second *Mohasco* element, that the cause of action arises from Defendants' actions in Kentucky, is also met.   The claims in this case include trademark infringement, thereby triggering the same analysis used by *Neogen* and *Bird*.  Fortune is a Kentucky corporation with its principal office in Lexington.   Defendants have brazenly misappropriated Fortune's trademarks, name and reputation in what was originally an attempt to profit from the sale of services to a single, targeted customer base:  Fortune's IRs.  The harm caused by Defendants' actions, as both *Neogen* and *Bird* make clear, has been felt at Fortune's headquarters in Kentucky.

Defendants now try to circumvent the "effects test" by arguing that the Website is merely an informational site that is not specific to any particular company.   As discussed above, Defendants wasted no time in modifying the Website after learning that they had been sued. Fortune's logos were removed from the Website, some (but not all) of the references to Fortune's tradenames were removed, and Defendants began posting articles about a variety of topics to dilute the focus on Fortune.  All of this was done in an attempt to cover up the fact that the Website, up until the very day that Defendants were served, consisted of one misappropriation after another of Fortune's intellectual property.  This is readily demonstrated by comparing Exhibits R and S.

The Court should begin its analysis of the final *Mohasco* element, that there be a substantial connection between Defendants' acts and the forum state, with the inference that it is met as a result of the first two elements having been met. *CompuServe*, 289 F.3d at 875. Even without the inference, however, this element is met under the facts of this case. The acts of which Fortune complains consist in part of Defendants' establishment of the Website to target Fortune's IRs through the misappropriation of Fortune's intellectual property. Fortune's logos and tradename were developed at Fortune's headquarters in Lexington, and its reputation has been built over years of work by its officers, each of whom resides in Kentucky. Defendants' decision to specifically target Fortune to the exclusion of all of the many other multilevel marketing companies in the country – along with their attempt to extort $2.5 million from Fortune and their impersonation of a Kentucky IR – is tightly connected with this forum.

The various unpublished decisions provided by Defendants do not change this. *Pharmerica Corp. v. Advanced Healthcare Solutions*, 2009 WL 3248014 (W.D. Ky. Oct. 6, 2009), involved a claim of tortious interference with contract. *Turek v. Mold-Rite Tool, Inc.*, 2006 WL 3068813 (E.D. Ky. Oct. 26 2006), involved claims of breach of contract, conversion, intentional interference with contractual relations, conspiracy, fraud and misrepresentation. *Oxford Round Table, Inc. v. Mahone*, 2007 WL 3342288 (W.D. Ky. Nov. 8, 2007), involved fraud and defamation claims. None of these cases involved claims of trademark infringement like those that Fortune has asserted in this case, and which are governed by decisions such as *Neogen* and *Bird*. Likewise, none of these cases involved acts of extortion and impersonation, as this case does. The only one of the unpublished decisions cited by Defendants that did involve a trademark infringement claim is *QSR Automations, Inc. v. KRS Corp.*, LLC, 2010 WL 1416700 (W.D. Ky. March 31, 2010). In *QSR*, however, the defendant had engaged in no business or

other interaction with the forum state.  Here, Defendants concede that they have interacted with at least some Fortune IRs in Kentucky, and Defendants have engaged in connected activities involving their attempt to extort $2.5 million from Fortune.

For these same reasons, Defendants cannot hide behind the traditional case law discussing the number of telephone calls and facsimile transmissions that were sent into the forum state.  Under Defendants' reasoning, the circumstances in which a defendant steals intellectual property created in Kentucky, then uses that intellectual property in another state, may only rarely subject the defendant to the jurisdiction of the courts of the state from which that property was taken.  Instead, under this same reasoning, unscrupulous defendants are free to use another party's intellectual property to (a) build up their own client base by confusing people into believing that an affiliation with the plaintiff exists, (b) lure the plaintiff's own sales force into the defendant's customer base as a result of confusion, and (c) profit from receiving compensation in exchange for services offered to those same people, who purchased the services believing that an affiliation exists where there actually is none.  This logic is supported by neither the law nor equity, and Fortune should not be forced to chase Defendants across the country when their intentional, tortious actions have caused harm here.

Instead, Defendants' actions here bear a remarkable resemblance to the alleged actions of the defendants in *Panavision*, *Zippo* and *Neogen*.  As the courts in each of those cases determined that personal jurisdiction could appropriately be exercised over non-resident defendants, so too should this Court exercise jurisdiction over Defendants.

## IV.
## CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss should be denied.

21

Respectfully submitted,


 /s/ Brian M. Johnson
Brian M. Johnson
Jason T. Ams
Greenebaum Doll & McDonald PLLC
300 West Vine Street, Suite 1100
Lexington, Kentucky  40507
Telephone:    859-231-8500
Facsimile:     859-255-2742
COUNSEL FOR PLAINTIFF

## <u>CERTIFICATE OF SERVICE</u>

I, Brian M. Johnson, hereby certify that on this 26th day of April, 2010, I filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send a notice of electronic filing e-mail to the following:

- **Fred E. Fugazzi , Jr**
  bfugazzi@bowlesrice.com

- **David Leightty**
  dleightty@earthlink.net

- **John Thomas Rawlings , Jr**
  trawlings@bowlesrice.com

- **Edward J. Smith**
  esmith@sglfirm.com,kburke@sglfirm.com


I further certify that I caused the foregoing to be served via U.S. Mail upon the following, who requires manual noticing:

George W. Cochran
Smith, Greenberg & Leightty PPLC
2321 Lime Kiln Lane, Suite C
Louisville, KY 40222


  /s/ Brian M. Johnson
COUNSEL FOR PLAINTIFF


3872375_3.doc